**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 21-111** |
| **v.** | * | **SECTION: "H"** |
| **ADRIAN DEXTER TALBOT, M.D.** | * | |

* * *

**MEMORANDUM IN SUPPORT OF THE UNITED STATES' MOTION TO REVOKE DEFENDANT'S BOND, FOR CIVIL CONTEMPT, TO DISQUALIFY COUNSEL FOR GOVERNMENT WITNESSES, AND TO ENFORCE PROTECTIVE ORDER**

**MAY IT PLEASE THE COURT:**

The United States of America, by and through undersigned counsel, respectfully submits this memorandum in support of its Motion to Revoke Bond, for Civil Contempt, to Disqualify Counsel for Government Witnesses, and to Enforce Protective Order. For the reasons more fully set forth below, the United States respectfully requests that this Honorable Court: (1) revoke the bond of defendant Adrian Dexter Talbot, M.D. ("Defendant") and detain him pending trial; (2) hold Defendant's curatrix, Geraldine Broussard Baloney, in contempt of court for her violation of court orders; (3) disqualify attorney N. Blake Peters and the law firm of Burgos & Associates, L.L.C. from representing any witnesses in this proceeding on the basis of conflict of interest; and (4) enforce the Protective Order [ECF No. 112] in this matter.

## BACKGROUND

### I. Procedural History.

On August 26, 2021, the Grand Jury impaneled in the Eastern District of Louisiana returned a seven-count Indictment, charging Defendant with one count of conspiracy to unlawfully distribute and dispense controlled substances in violation of 21 U.S.C. § 846; four counts of unlawful distribution and dispensing of controlled substances in violation of 21 U.S.C. § 841(a)(1);

one count of maintaining a drug-involved premises in violation of 21 U.S.C. § 856(a)(1); and one count of conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349. [ECF No. 1.] The charges relate to allegations that Defendant, a medical doctor, prescribed Schedule II controlled substances to individuals outside the scope of professional practice and not for a legitimate medical purpose and caused the fraudulent billing of Medicare, Medicaid, and Blue Cross and Blue Shield of Louisiana for the filling of prescriptions that were written without an appropriate patient examination or determination of medical necessity for the prescriptions. [*Id.*] Defendant is charged with unlawfully distributing more than 1,200,000 doses of Schedule II controlled substances, including oxycodone, and causing the submission of more than $5.1 million in false and fraudulent claims to health care benefit programs. [*Id.* at ¶ 35.]

On September 10, 2021, Defendant filed a Motion for Competency Evaluation claiming that he suffered from dementia, and as evidence in support of that motion, represented to the Court that he had been interdicted, and that his wife, Geraldine Broussard Baloney ("Broussard"), was appointed as his curatrix. [ECF No. 8.]

On September 17, 2021, Defendant made his initial appearance. [ECF No. 14.] The United States did not request detention, and Defendant was released on a $500,000.00 personal surety bond subject to various special conditions, including that "he shall not interfere with, intimidate, threaten, harm, or influence any juror, government witnesses, victims or federal agents," and that he "avoid all contact with witness [and] co-defendants." [*Id.* at 2-3.] At the initial appearance, Broussard was sworn and agreed to serve as surety and third-party custodian. [*Id.*] Defendant's arraignment was deferred until after a competency determination was made. [*Id.*]

Also on September 17, 2021, the Court (Judge Van Meerveld) entered an Order Setting Conditions of Release, noting that Defendant was placed in the custody of Broussard, and that

Defendant was to "avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution, including: witnesses and co-defendants." [ECF No. 17 at 2.] This Court's Order Setting Conditions of Release also provided, in relevant part, that Broussard "agrees to (a) supervise the defendant, (b) use every effort to assure the defendant's appearance at all court proceedings, and (c) notify the court immediately if the defendant violates a condition of release or is no longer in the custodian's custody." [*Id.*] On the same day, Defendant signed and acknowledged the penalties and sanctions, including revocation, for violating his conditions of release. [*Id.* at 4.]

Following resolution of the initial competency proceedings in this case, on January 20, 2023, Defendant was arraigned and released on the same bond conditions. [ECF No. 109.]

Prior to producing discovery in this matter, on February 7, 2023, the United States filed an Unopposed Motion for Protective Order Regarding Discovery Materials. [ECF No. 110.] On February 8, 2023, this Court entered the requested Protective Order. [ECF No. 112.] The Protective Order provides, in pertinent part:

> All materials produced or furnished in discovery by the United States (hereinafter referred to as "Discovery Material") shall be used by the Defendant only as necessary for the investigation and defense of this criminal case and shall only be reviewed and revealed among the "defense team," consisting of (a) the Defendant; (b) the Defendant's counsel; (c) any secretaries, paralegals, and investigators who work at defense counsel's direction; (d) any potential defense witnesses; (e) any experts or consultants retained by the Defendant; and (f) Defendant's curatrix.

[*Id.* at ¶ 1.]

The Protective Order further provides that the "Discovery Material may not be used by the Defendant for any other purpose, or furnished to anyone else by the Defendant, without further Order of this Court." [*Id.* at ¶ 2.]

The United States has thus far issued two discovery productions to Defendant, including voluntarily turning over reports of interviews of witnesses prior to any *Jencks* or *Giglio* deadline.

The trial of this matter is currently set for July 8, 2024. [ECF No. 144.]

## II. Conduct of Defendant and/or His Curatrix.

As the United States has been preparing for trial, it has scheduled meetings with various witnesses that the United States intends to subpoena to testify at trial, including witnesses identified in the Indictment as Office Employee 1 and Nurse Practitioner 3, both of whom worked at Defendant's clinic, Medex Clinical Consultants Professional Limited Liability Company ("Medex").[1] Neither Office Employee 1 nor Nurse Practitioner 3 are named in the Indictment as co-conspirators, and the United States has never issued a target letter to either individual. More importantly, at this time, Office Employee 1 and Nurse Practitioner 3 cannot be prosecuted with any crimes arising from the conduct alleged in the Indictment, as the statute of limitations has run. It follows that both Office Employee 1 and Nurse Practitioner 3 have agreed to meet with the United States for interviews and trial preparation on numerous occasions, voluntarily and without an attorney. Indeed, on May 16, 2024, the United States scheduled a meeting with Office Employee 1 for June 3, 2024, at his/her residence.

On May 29, 2024, the United States was advised by another witness, identified as Nurse Practitioner 1 in the Indictment, that he/she had received a forwarded text message from Office Employee 1, stating:

> Hi [Nurse Practitioner 1]. This is [Office Manager 1] from Drew Talbot's office. Geri, Doc's power of attorney person asked me to send you this text.
>
> Just got this text from Geri.

[1] According to the Louisiana Secretary of State's official website, Medex has been inactive since 2019, and an Affidavit to Dissolve was filed on February 25, 2021.

> Good morning, the Care Center has retained and will cover the cost of Burgos & Associates Law Firm to represent the following employees (present and former) [Office Manager 1], [Witness], [Nurse Practitioner 2], [Nurse Practitioner 3], and [Nurse Practitioner 1]. Blake Peters is the attorney that the firm will assign. Cesar Burgos is the senior attorney. They will be contacting you individually to discuss. Please let me know if you have any questions. The firm's number is (504)488-3722Please [sic] forward this information to the others. Thanks

[*See* Text Message to Nurse Practitioner 1, attached hereto as Exhibit A.] This bond violation was not reported to the Court by Defendant or Broussard, his third-party custodian.

On May 29, 2024, upon learning of this text message, undersigned counsel contacted Defendant's counsel, notifying them of what had transpired, and raising concerns of witness tampering. [*See* 5/29/2024 Email Chain with Defense Counsel, attached hereto as Exhibit B.] Defense counsel replied that they intended to look into the situation, but have not yet contacted the undersigned or, to the undersigned's knowledge, taken any remedial action. [*Id.*]

On May 31, 2024, at 10:58 a.m., Office Manager 1 contacted one of the case agents, Special Agent Peter Silessi of the Office of Inspector General for the U.S. Department of Health and Human Services and left a voicemail confirming the previously scheduled meeting with the government on June 3, 2024. [*See* Investigative Report, attached hereto as Exhibit C.]

On May 31, 2024, at 11:44 a.m., undersigned counsel received correspondence from attorney N. Blake Peters ("Peters") of Burgos & Associates, L.L.C., advising that he had "just been retained to represent the interests of some potential witnesses in the above matter:" and, specifically identified Office Manager 1, Nurse Practitioner 3, and another potential government witness. [*See* 5/31/2024 Letter from Peters, attached hereto as Exhibit D.] Peters requested to "be present for any phone calls, meetings, or debriefings of any kind" regarding his clients. [*Id.* at 2.]

Peters also requested that the prescheduled meeting with Office Manager 1 be rescheduled to accommodate his schedule.

On May 31, 2024, at 1:03 p.m., Peters contacted Special Agent Silessi regarding his purported representation of these three government witnesses and advised Special Agent Silessi that if the government proceeded to meet with Office Manager 1 as scheduled, Peters would instruct him/her not to speak with the government. [*See* Ex. C.]

On June 1, 2023, undersigned counsel emailed Peters requesting that: (1) he confirm who retained and was paying for his services; and (2) he confirm that he intended to advise Office Manager 1 not to speak with the government, despite that he/she is not a target of the government's investigation and that the statute of limitations has run on any potential crimes arising out of the conduct alleged in the Indictment. [*See* Email Chain with Peters, attached hereto as Exhibit E.] Peters declined to answer either question, but stated that Office Manager 1 and others wanted to ensure that their interests were protected "especially when they were named in the indictment as unindicted co-conspirators." [*Id.*] Surprisingly, Peters also referenced statements made by these government witnesses—statements which the witnesses themselves have not been provided, and which could only have been provided to Peters by a member of the defense team, as defined in the Protective Order. [*Id.*]

In light of the United States' grave concerns about the conduct of Defendant, Broussard, and potentially other members of the defense team, and the implications of that conduct on the fairness of these proceedings, it felt obligated to raise these issues with the Court.

## LAW AND ARGUMENT

### I. This Court Should Revoke Defendant's Bond, Issue a Warrant, and Detain Defendant Pending Trial.

#### A. Legal Standard.

Title 18, United States Code, Section 3148(a) provides that "[a] person who has been released under Section 3142 of this title, and who has violated a condition of his release, is subject to a revocation of release, an order of detention, and a prosecution for contempt of court." Section 3148(b) provides that:

> **(b) Revocation of release.**--The attorney for the Government may initiate a proceeding for revocation of an order of release by filing a motion with the district court. A judicial officer may issue a warrant for the arrest of a person charged with violating a condition of release, and the person shall be brought before a judicial officer in the district in which such person's arrest was ordered for a proceeding in accordance with this section. To the extent practicable, a person charged with violating the condition of release that such person not commit a Federal, State, or local crime during the period of release, shall be brought before the judicial officer who ordered the release and whose order is alleged to have been violated. The judicial officer shall enter an order of revocation and detention if, after a hearing, the judicial officer--
>
> **(1)** finds that there is--
>
> **(A)** probable cause to believe that the person has committed a Federal, State, or local crime while on release; or
>
> **(B)** clear and convincing evidence that the person has violated any other condition of release; and
>
> **(2)** finds that--
>
> **(A)** based on the factors set forth in section 3142(g) of this title, there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or
>
> **(B)** the person is unlikely to abide by any condition or combination of conditions of release.
>
> If there is probable cause to believe that, while on release, the person committed a Federal, State, or local felony, a rebuttable presumption arises that no condition or

> combination of conditions will assure that the person will not pose a danger to the safety of any other person or the community. If the judicial officer finds that there are conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community, and that the person will abide by such conditions, the judicial officer shall treat the person in accordance with the provisions of section 3142 of this title and may amend the conditions of release accordingly.

18 U.S.C. § 3148(b).

**B. The Bond Violation Requires Mandatory Revocation.**

This Court must revoke Defendant's bond and order him detained pending trial under Section 3148(b) because there is clear and convincing evidence that he violated the conditions of his bond by contacting government witnesses, seemingly in an attempt to interfere with and/or influence those witnesses. Specifically, one of Defendant's conditions of release provided that he "avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution, including: witnesses and co-defendants." [ECF No. 17 at 2.] Defendant was also advised that "he shall not interfere with, intimidate, threaten, harm, or influence any juror, government witnesses, victims, or federal agents." [ECF No. 14 at 2.] Broussard also agreed to these conditions as Defendant's third-party custodian. [ECF No. 17 at 2; ECF No. 14 at 2.]

Moreover, as previously discussed, Defendant agreed to be interdicted, and Broussard was appointed to serve as his curatrix. Under Louisiana jurisprudence, interdiction is considered one of the most powerful involuntary legal regimes that may be applied to a person. *Sanders v. Dupree*, No. 53,296 (La. App. 2 Cir. 3/4/20), 293 So.3d 138, 143. Its effect has been described as a "radical displacement of legal identity: it nullifies the interdict's own actions, and transfers his decision-making power to a surrogate." *Id.* (quoting Jean Louise Carriere, *Reconstructing the Grounds of Interdiction*, 54 La. L. Rev. 1199, 1199 (1994)). According to the Louisiana Supreme Court,

"[t]here is nothing which [an interdict] is capable of doing legally . . . . His curator is substituted for him, is the human agency through whom the interdict acts, and the two are legally inseparable." *Sanders*, 293 So.3d at 143 (quoting *Converse v. Dicks*, 179 La. 339 (1934)). Therefore, as Defendant's curatrix and third-party custodian, Broussard acts on behalf of Defendant. It is clear that, through Broussard, Defendant has violated his bond conditions by indirectly contacting witnesses, namely Office Manager 1, Nurse Practitioner 1, Nurse Practitioner 3, and others, and by attempting to interfere with and influence those witnesses. These contacts have not been reported as required by the Court's orders setting Defendant's conditions of release pending trial in this matter. [*See* ECF No. 17 at 2.]

Given the serious and flagrant violations of this Court's orders, it is appropriate to conclude that Defendant is unlikely to abide by any condition or combination of conditions of release. Indeed, his third-party custodian, who must be supervising Defendant and assuring compliance with his bond conditions, has participated in the bond violations. As a consequence, Defendant's bond should be revoked. Courts have revoked defendants' bonds in similar situations for making contact with witnesses in violation of bond conditions. *See*, *e.g.*, *United States v. Kahn*, 769 F. App'x 664, 665 (10th Cir. 2019); *United States v. Hickerson*, Crim. No. 5-18-cr-00111-GFVT-MAS, 2021 WL 2169510, at *3 (E.D. Ky. May 27, 2021); *United States v. Rizzo*, No 16-20732-7, 2018 WL 2020098, at *1 (E.D. Mich. Apr. 30, 2018); *United States v. Harris*, No. 2:10 CR 123, 2012 WL 951487, at *2 (N.D. Ind. Mar. 19, 2012); *United States v. Sharp*, No. 302-00149C01, 2006 WL 2434247, at *1 (S.D. W. Va. Aug. 22, 2006). The same result should apply here, and this Court "shall" revoke Defendant's bond. 18 U.S.C. § 3148(b).

## II. This Court Should Hold Broussard in Contempt of Court for Disobeying the Order of Release Conditions to Which She Agreed as Defendant's Third-Party Custodian.

### A. Legal Standard.

District courts have inherent power to enforce compliance with their orders through civil contempt. *See*, *e.g.*, *Shillitani v. United States*, 384 U.S. 364, 370 (1966); *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995). Under Fifth Circuit law, to establish civil contempt, the movant must show by clear and convincing evidence "that (1) a court order was in effect, (2) the order required certain conduct by the respondent, and (3) the respondent failed to comply with the court's order." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000) (quoting *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992)). The contemptuous actions need not be willful, and good faith is not a defense. *Id.*; *Chao v. Transocean Offshore, Inc.*, 276 F.3d 725, 728 (5th Cir. 2002).

When a movant establishes by clear and convincing evidence that the respondent has failed to comply with a clear and ambiguous court order, a finding of civil contempt is appropriate. *See*, *e.g.*, *F.D.I.C. v. LeGrand*, 43 F.3d 163, 170-71 (5th Cir. 1995) (affirming lower court's finding of civil contempt based on a defendant's violation of court's order). In fashioning sanctions for civil contempt, district courts should consider "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *United States v. United Mine Workers*, 330 U.S. 258, 304 (1947). Appropriate sanctions may include a coercive daily fine, a compensatory fine, or coercive incarceration. *Id.*; *see also Int'l Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 827-29 (1994).

### B. Broussard Disobeyed this Court's Orders.

Broussard executed the Order Setting Conditions of Release of Defendant as Defendant's Custodian and agreed on his behalf to avoid all contact, directly or indirectly, with any person who

is or may be a victim or witness in the investigation or prosecution. [ECF No. 17 at 2.] Broussard was also present at Defendant's initial appearance, where Defendant was advised of the special conditions that "he shall not interfere with, intimidate, threaten, harm, or influence any juror, government witnesses, victims, or federal agents." [ECF No. 14 at 2.] It is undisputed that this Court's Orders were both clear and unambiguous. [*See* ECF Nos. 14 & 17.]

Nevertheless, Broussard proceeded to contact a witness on Defendant's behalf whom the government had interviewed multiple times, and request that the witness forward her message to four other witnesses, three of whom have also met with the government multiple times, in an effort to hire counsel for those witnesses to be present at all interviews and debriefs with the government in preparation for trial. [*See* Ex. A.] Broussard then retained counsel for three witnesses, and counsel, presumably acting at the direction of his client, Broussard, has instructed one of the witnesses not to speak with the United States at a previously scheduled meeting. [*See* Ex. C.] Therefore, not only did Broussard contact these witnesses on Defendant's behalf, but she also took concrete actions to interfere with and influence these witnesses. Broussard's actions demonstrate her willful disregard for this Court's Orders. This Court should not permit Broussard to flout its orders and should hold her in civil contempt and fashion appropriate sanctions to coerce compliance with its Orders, perhaps in the nature of a fine and an order that such further conduct will result in imprisonment so that the United States is able to continue its trial preparation unhindered by the interference.

## III. Attorney N. Blake Peters and His Law Firm Should Be Disqualified From Representing Any Witnesses in This Matter.

### A. Legal Standard.

A motion to disqualify an attorney is substantive and determined by federal legal standards. *See In re Dresser Indus., Inc.*, 972 F.2d 540, 543 (5th Cir. 1992); *see also Johnson v. Clark Gin*

*Serv., Inc.*, No. 15-3315, 2016 WL 7017267, at *7 (E.D. La. Dec. 1, 2016). This Court has expressly adopted Louisiana's Rules of Professional Conduct ("Louisiana Rules") for these standards, and attorneys practicing in this Court are thus subject to those rules. *See* LR 83.2.3. Thus, this Court looks to those rules when considering motions to disqualify. However, this Court also reserves the right to diverge from the Louisiana Rules, and the Louisiana Rules are thus not the "sole authority" governing motions to disqualify. *Sumpter v. Hungerford*, Civ. Action No. 12-717, 2013 WL 2181296, at *5 (E.D. La. May 20, 2013). When assessing a motion to disqualify, this Court also considers "the ethical rules announced by the national profession in light of the public interest and the litigants' rights." *In re American Airlines, Inc.*, 972 F.2d 605, 610 (5th Cir. 1992). In addition, courts consider whether the attorney's conflict has the appearance of impropriety or creates a possibility that a specific impropriety will occur, and the Court considers whether "the likelihood of public suspicion from the impropriety outweighs any social interests which will be served by the lawyer's continued participation in the case." *In re Dresser Indus.*, 972 F.2d at 543-44 (internal citation omitted). This is so because "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153, 160 (1988).

The Fifth Circuit has stated that it is particularly "sensitive to preventing conflicts of interest," *In re ProEduc. Int'l, Inc.*, 587 F.3d 296, 299 (5th Cir. 2009) (internal quotation marks omitted), and district courts are therefore "obligated to take measures against unethical conduct occurring in connection with any proceeding before [them]." *In re: Am. Airlines, Inc.*, 972 F.2d at 611 (internal quotation omitted). The appropriate remedy is disqualification of the attorney. *Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 266 (5th Cir. 2001).

Louisiana Rule of Professional Conduct 1.7 applies to this matter. Rule 1.7 provides that a lawyer shall not represent a client if the representation involves a concurrent conflict of interest, which exists if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." La. R. Prof. Conduct 1.7(a)(2).

Also particularly applicable is Rule 1.8(f), which provides that "[a] lawyer shall not accept compensation for representing a client from one other than the client" unless: "(1) the client gives informed consent . . . ; (2) there is no interference with the lawyer's independence or professional judgment or with the client-lawyer relationship; and (3) information relating to representation of a client is protected as required by Rule 1.6." La. R. Prof. Conduct 1.8(f).

Lastly, under Rule 7.4(a), "a lawyer shall not solicit professional employment from a prospective client with whom the lawyer has no family or prior lawyer-client relationship, in person, by person to person verbal telephone contact, through others acting at the lawyer's request or on the lawyer's behalf or otherwise, when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain." La. R. Prof. Conduct 7.4(a).

**B. This Court Should Disqualify Peters and His Firm from Representing Any Witnesses in this Matter After Having Been Retained and Paid by Defendant and/or His Curatrix, As the Representation Violates Federal Law and the Louisiana Rules of Professional Conduct .**

Courts and commentators have recognized the inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party, particularly when the third party is the operator of the alleged criminal enterprise. *Wood v. Georgia*, 450 U.S. 261, 268-69 (1981). The Supreme Court quoted a New Jersey Supreme Court opinion finding that "it is . . . inherently wrong for an attorney who represents only the employee to accept a promise to pay from one whose criminal liability may turn on the employee's testimony." *Id.* at 269 n.15 (quoting

*In re Abrams*, 56 N.J. 271, 276 (1970)); *see also United States v. Locascio*, 6 F.3d 924, 932 (2d Cir. 1993) ("Ethical considerations warn against an attorney accepting fees from someone other than the client. As we stated in a different context, the acceptance of such benefactor payments may subject an attorney to undesirable outside influence and raises an ethical question as to whether the attorney's loyalties are with the client or the payor.") (citing *In re Grand Jury Subpoena Served Upon John Doe*, 781 F.2d 238, 248 n.6 (2d Cir. 1985) (*en banc*) (internal quotations omitted)). The Southern District of New York noted that "[b]enefactor payments potentially strike at the heart of the attorney-client relationship, and thus at the heart of the adversarial process." *United States v. Castellano*, 610 F. Supp. 1151, 1164 (S.D.N.Y. 1985).

In this case, based on Broussard's text message to Office Employee 1 and Peters' failure to specify who had retained him and was paying his fees, it appears that Peters was retained by, and his fees are being paid by, Defendant and/or his curatrix, Broussard, on Defendant's behalf, to represent government witnesses with no Fifth Amendment exposure who will testify at the trial against Defendant. [*See* Ex. A.] It appears that, in the course of that "representation," Peters has been provided with certain discovery materials in this case, that are subject to the Protective Order, and the government cannot speculate as to what Peters has been told by Defendant or Broussard about his "representation" or what other materials have been provided to him. [*See* Ex. E, referencing witness statements.] Peters has indicated his intent to appear at all meetings between these witnesses and the government, which will potentially make him privy to the government's work product and trial strategy, which he could pass on to Defendant and Broussard, who, after all, are likely paying his bills. [*See* Ex. D.]

The simultaneous representation by Peters of three government witnesses exacerbated by his receipt of benefactor fees from Defendant and/or Broussard does not comport with the law and

the prevailing ethical standards of the legal profession. This conduct violates Rules 1.7 and 1.8, as it creates a significant risk that the representation of the witnesses will be materially limited by the lawyer's responsibilities to Broussard, and there will likely be interference with Peters' independence and professional judgment. Moreover, it simply cannot be argued that these tainted "legal proceedings appear fair to all who observe them." *Wheat*, 486 U.S. at 160. Where an attorney's continued representation in a case would compromise the integrity of the judicial process, the court retains the discretion to reject any waiver of conflict. *See*, *e.g.*, *United States v. Jones*, 381 F.3d 114, 118, 120 (2d Cir. 2004); *Wheat*, 486 U.S. at 159-60.

Lastly, concerns normally present when considering disqualification motions are not present here. The witnesses themselves did not seek out and retain Peters, so he is not their counsel of choice.[2] The witnesses are not defendants in this case so have no right to representation, much less representation by Peters. The three government witnesses also have no Fifth Amendment exposure, as the statute of limitations has run on any potential criminal conduct related to this trial. Nor have the three government witnesses independently expressed a need or desire for representation. The witnesses will not suffer any prejudice by disqualifying Peters and his law firm, as the representation began a few days ago. As such, this Court need only decide, unfettered by choice of counsel issues, whether the actual conflict and protection and preservation of the integrity of the proceedings concerns warrant disqualification. Under these facts and circumstances, disqualification is the only proper resolution in this matter.

---

[2] The fact that it appears that Peters reached out to the witnesses directly to solicit the representation also constitutes a violation of La. R. Prof. Conduct 7.4(a). [*See* Ex. A, wherein Broussard advises Office Employee 1 that the Burgos Law Firm would be contacting the witnesses individually to discuss.]

**IV. This Court Should Enforce the Protective Order in this Matter.**

Federal Rule of Criminal Procedure 16(d)(1) permits a court for good cause to restrict discovery or inspection by way of a protective order. Fed. R. Crim. P. 16(d)(1). In this case, this Court entered such a protective order, which provides that discovery material may only be shared among the defense team, which consists of: "(a) the Defendant; (b) the Defendant's counsel; (c) any secretaries, paralegals, and investigators who work at defense counsel's direction; (d) any potential defense witnesses; (e) any experts or consultants retained by the Defendant; and (f) Defendant's curatrix." [ECF No. 112.] The Protective Order further provides that "Discovery Material may not be used by the Defendant for any other purpose, or furnished to anyone else by the Defendant, without further Order of this Court." [*Id*.]

Peters' email to undersigned counsel suggests that he is in possession of statements from government witnesses in this matter. [*See* Exhibit E.] Peters is not a member of the defense team, as defined in the Protective Order. The defense team never notified the government that Peters was a member of the defense team or sought the Court's permission to modify the terms and conditions of the Protective Order to include Peters in the "defense team." The United States did not furnish its witnesses or Peters with statements; therefore, Peters could have only obtained such statements from the defense team. The defense team's furnishing protected discovery materials to Peters violates the Protective Order. The furnishing of those statements raises questions about the defense team's intentions in doing so, in particular, whether they were intended to ultimately be shown to the government's witnesses in an attempt to change their testimony.

Under Fed. R. Crim P. 16(d)(2), if a party fails to comply with a discovery order, the court may "enter any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2). In this case, the United States submits that this Court should order Defendant to identify who

provided the protected materials to third parties, provide the names of any unauthorized parties to whom he or his representatives have provided protected materials, and identify the protected materials that were provided to such individuals in order for this Court to determine appropriate sanctions, which could include contempt sanctions as appropriate.

## CONCLUSION

For the foregoing reasons, the United States respectfully moves this Honorable Court to grant its Motion to Revoke Bond, for Civil Contempt, to Disqualify Counsel for Government Witnesses, and to Enforce Protective Order and (1) revoke the bond of Defendant and detain him pending trial; (2) hold Defendant's curatrix, Geraldine Broussard Baloney, in contempt of court for her violation of court orders; (3) disqualify attorney N. Blake Peters and the law firm of Burgos & Associates, L.L.C. from representing any witnesses in this proceeding on the basis of conflict of interest; and (4) enforce the Protective Order [ECF No. 112] in this matter.

Respectfully submitted,

DUANE A. EVANS
UNITED STATES ATTORNEY
EASTERN DISTRICT OF LOUISIANA

GLENN S. LEON
CHIEF
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION

*/s/ Sara E. Porter*
Sara E. Porter (LA Bar #34190)
Justin M. Woodard (LA Bar #37924)
Gary A. Crosby II (D.C. Bar #1753814)
Trial Attorneys
Fraud Section
U.S. Department of Justice, Criminal Division
1400 New York Ave., N.W.
Washington, D.C. 20005
Telephone: (202) 257-6770
sara.porter@usdoj.gov
justin.woodard@usdoj.gov
gary.crosby.ii@usdoj.gov

**CERTIFICATE OF SERVICE**

I, Sara E. Porter, hereby certify that on June 3, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record. I also served the foregoing upon N. Blake Peters, Esq. via electronic mail.

*/s/ Sara E. Porter*
Sara E. Porter
Trial Attorney