**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO: 21-111** |
| **v.** | * | **SECTION: "H" (2)** |
| **ADRIAN DEXTER TALBOT, M.D.** | * | |

* * *

**MEMORANDUM IN OPPOSITION TO GOVERNMENT'S MOTION TO REVOKE BOND, FOR CIVIL CONTEMPT, TO DISQUALIFY COUNSEL FOR GOVERNMENT WITNESSES AND TO ENFORCE PROTECTIVE ORDER**

Now into Court, individually and through undersigned counsel, comes, Attorney Geraldine Broussard, and respectfully submits this Memorandum In Opposition To The Government's Motion To Revoke Bond, For Civil Contempt, To Disqualify Counsel For Government Witnesses And To Enforce Protective Order, specifically, its move to have Attorney Broussard held in contempt of court for violation of this court's order, as is more fully set forth herein.

**I.**

**UNETHICAL CONDUCT AND MISSTATEMENTS OF FACT**

The Government's motion is frivolous and wholly without merit- seemingly filed to intimidate and harass the defense. And, is clearly an effort to have a chilling effect of Defendant's Sixth Amendment right to defend himself. While the Government has had unfettered access to interview and groom "potential witnesses" for six year, the defendant has avoided all contact since the initiation of this prosecution. If any party has acted unethically during these proceedings, it has been the Government. First, the Government offered Dr. Ted Bloch to the defense and the Court as a Court appointed expert to provide an independent evaluation of the defendant without

disclosing that it had been consulting with Dr. Bloch before Dr. Talbot was indicted and that Dr. Bloch assisted the Government in drafting its response to Defendant's Motion for Competency Evaluation.[1] This resulted in depriving the Court of ever having an independent evaluation of Dr. Talbot's competency as required by 18 U.S.C.S. § 4241 et seq.

Dr. Bloch brought in Dr. Chafetz who lied to this Court about the number of psychometric test he administered to evaluate Dr. Talbot. Chafetz reported and testified that he administered six (6) psychometric test- then admitted under cross examination that he administered two more test not listed in his report- or a total of eight (8) test. We now know that he administered thirteen tests (13) and Dr. Talbot passed all thirteen.[2] (see Exhibit 'A') Thirdly, other than Broussard, no one knew that Dr. Talbot was being treated at the Wein Center for Alzheimers- Not even Talbot's family. Yet, shortly after Attorney Billy Gibben's informed the Government and the Court at the March 1, 2023 status conference that Dr. Talbot was being treated at the Wein Center, "somebody dropped a dime" to the Wein Center and suggested that they Google Dr. Talbot.[3] Shortly thereafter, excerpts of articles related to Defendant's indictment were added to Talbot's medical records. This, your Honor, I respectfully suggest is a pattern of unethical conduct.

Lastly, to address the Government's intentional misstatements, Dr. Talbot did not voluntarily interdict himself. Broussard initiated interdiction proceedings after reporting to Dr. Talbot's treating neurologist, Dr. James Nelson, that Dr. Talbot could not remember what he did with over $25,000 dollars back in late 2020. When Dr. Nelson asked Dr. Talbot about the misplaced money, Dr. Talbot agreed that he did not remember what he did with the money. And, when asked if he agreed that he needed assistance with his finances, Dr. Talbot agreed. Broussard

[1] See March 22, 2022 Tr. at 179:1-7.
[2] Begali 9/10/23 Report- Appendix A Letter by Dr. Elizabeth Sherman 3-6-23 see copy attached.
[3] Competency Hearing Transcript, pg. 130, L 19-22.

subsequently filed the appropriate proceedings in Civil District Court along with Dr. Nelson's affidavit. After a full hearing on the matter, the Court ordered the interdiction.

## II.

## The Government Has Failed to Set Forth Clear and Convincing Evidence that Broussard Disobeyed A Clear and Unambiguous Court Order

In the case at bar, the Government has failed to show by clear and convincing evidence that Broussard disobeyed specific and definite language in an Order, that clearly and unambiguously order her to do or not do something. This Court has long held that contempt is committed only if a person violates a court order requiring in specific and definite language that a person do or refrain from doing an act. *Baddock v. Villard (In re Baum),* 606 F.2d 592, 593 (5th Cir.1979). "The judicial contempt power is a potent weapon which should not be used if the court's order upon which the contempt was founded is vague or ambiguous." *Id.* (citing *International Longshoremen's Ass'n, Local 1291, v. Philadelphia Marine Trade Ass'n,* 389 U.S. 64, 76, 88 S. Ct. 201, 208, 19 L. Ed. 2d 236 (1967)). [**4] Martin v. Trinity Indus., Inc., 959 F.2d 45, 47 (5th Cir. 1992).

"There are three essential elements which must be established before a party can be held in civil contempt: 1) there must be an order that is clear and unambiguous; 2) the proof of noncompliance with that order must be clear and convincing; and, 3) it must be shown that the contemnor has not been reasonably diligent and energetic in attempting to accomplish what was ordered." *Id.* (citing *Schmidt v. Stone*, No. 14 Civ. 2519 (RJD) (CLP), 2019 U.S. Dist. LEXIS 119871, at *10 (E.D.N.Y. July 18, 2019)). *Da Silva v. N.Y.C. Transit Auth*., 2022 U.S. Dist. LEXIS 223142, at *7 (E.D.N.Y. Dec. 9, 2022).

"A party may be held in civil contempt for failure to comply with a court order if "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995). Regarding the first element, an order is clear and unambiguous if it is "specific and definite enough to apprise those within its scope of the conduct that is being proscribed." *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989). As to the second element, the burden of establishing contemptuous conduct is borne by the moving party, *Latino Officers Ass'n of City of N.Y., Inc. v. City of N.Y.*, 558 F.3d 159, 164 (2d Cir. 2009), and "[i]n the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate a reasonable certainty that a violation occurred," *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002). *Raleigh v. Baribault*, No. 3:22-CV-01069 (VDO), 2024 U.S. Dist. LEXIS 62710, at *4 (D. Conn. Apr. 4, 2024).

With respect to the first and second elements of the contempt analysis, the Government has not shown that Broussard failed to comply with an Order that clearly and unambiguously directed Broussard to "avoid all contact, directly or indirectly , with any person who is or may be a victim or witness in the investigation or prosecution, including witnesses and co-defendants". See *Perez*, 2022 U.S. Dist. LEXIS 168747, at *3. <u>Da Silva v. N.Y.C. Transit Auth., 2022 U.S. Dist. LEXIS 223142, at *10-11 (E.D.N.Y. Dec. 9, 2022)</u>. In the instant case, the Conditions of Release commence with the following statement: "Pursuant to 18 U.S.C. 3142(c)(1)(B), the court may impose the following least restrictive condition(s) only as necessary to reasonably assure the appearance of the person as required and the safety of any other person and the community". (ECF 17). The Defendant's Conditions of Release (hereinafter "the Conditions") provide that "**the**

**Defendant must:** g) avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution, including witnesses and co-defendants". Broussard is not the Defendant, she is the Defendant's custodian. As to the Custodian, the Conditions state that:

> "(6) The defendant is placed in the custody of Geraldine Broussard Baloney… . who agrees to (a) supervise the defendant, (b) use every effort to assure the defendant's appearance at all court proceedings, and (c) notify the court immediately if the defendant violates a condition of release or is no longer in the custodian's custody". Signed by Broussard on September 17, 2021.

Broussard signed the Conditions in her capacity as Custodian of the defendant, not in her capacity as Curatrix. The Conditions do not dictate that Broussard make court appearances. It does not direct that Broussard be restricted in her activities. It does not require Broussard to report to U.S. Probation. It does not require Broussard to surrender her passport, and so on. Nothing in the Conditions suggests that the Court intended to restrict Broussard's activities. At the issuance of the Conditions, Broussard appeared and agreed to ensure that among other things, the Defendant would make all court appearances and that the Defendant have no contact with any of the persons listed in the Conditions. Because the Government fails to identify a single specific and definite mandate that unequivocally proscribes the conduct complained of, this court should deny the Government's motion civil contempt.

As to the third element, the Government has not shown that Broussard was not diligent in attempting to comply with the Order. Broussard has ensure the Defendant's appearance at ALL hearings and proceedings in this matter; she has removed him from any contact with employees of the Care Center, has been in regular contact with the Virgin Islands probation officer; and has limited her own personal contact with employees of the Care Center to business matters. She has diligently and energetically accomplished what this Court ordered, and the

Defendant has complied with all orders of this Court. Accordingly, the Government has failed to meet the necessary elements for finding of civil contempt.

Further to the Government's failure to establish that Broussard disobeyed a direct order of this Court, see *US v. Abreu*, "Civil contempt is designed to force the [disobedient party] to comply with an order of the court." *United States v. Abreu*, No. EP-06-CR-2576-DB, 2007 U.S. Dist. LEXIS 36931, at *11 (W.D. Tex. Mar. 1, 2007) (*citing Willy v. Coastal Corp.*, 503 U.S. 131, 139, 112 S. Ct. 1076, 117 L. Ed. 2d 280 (1992)). The Fifth Circuit has stated that the elements of civil contempt are "(1) that a court order was in effect, and (2) that the order required certain conduct **by the respondent**, and (3) that **the respondent failed to comply** with the court's order." (emphasis added) *Ingalls v. Thompson (In re Bradley)*, 588 F.3d 254, 264 (*citing Fed. Deposit Ins. Corp. v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995)). *Williams v. Beauregard Par*., No. 2:08-CV-355, 2014 U.S. Dist. LEXIS 35476, at *10 (W.D. La. Mar. 17, 2014).

In the instant case, the individuals that the Government complain Broussard had proscribed contact with are present and/or former employees of the Care Center. Despite owning a medical practice with employees, the Defendant has had **zero** contact with the employees of that practice and Broussard has severely limited any contact that she has had with employees to necessary business contact. When Office Employee 1 contacted Broussard about the Government's attempt to interview her a fourth time, and advised that she received complaints from other employees that they needed legal counsel, Broussard immediately informed the employee that she could not give her legal advice and that she would look into addressing the concerns of the employees. After advising defense counsel about the call, Broussard contacted an independent law firm to offer representation to those employees that wished to have representation. To avoid having unnecessary contact with the employees, Broussard instructed Office Manager 1 to notify the other

employees of the availability of counsel. Because the Government has failed to set forth any clear and convincing evidence that Broussard has done anything in contravention to the plain language of the Defendant's Conditions of Release, this Court should deny the Government's Motion to for civil contempt.

**III.**

**The Government Has Failed to Set Forth Clear and Convincing Evidence that Broussard Violated The Protective Order**

The Government acknowledges that the Protective Order provides that discovery furnished shall be used by the Defendant **as necessary** for the investigation and defense by the defense team and, that **"potential defense witnesses"** are part of the defense team. The plain language of the Protective Order states that:

> "All materials produced and furnished in discovery by the United States (hereinafter referred to as "Discovery Material" shall be used by the Defendant **only as necessary** for the investigation and defense of this criminal case and shall only be reviewed and reveal among the "defense team," consisting of (a) the Defendant; (b) the Defendant's counsel; (c) any secretaries, **paralegals and investigators who work at defense counsel's direction; (**d) any potential defense witnesses; (e) any experts or consultants retained by the Defendant; and (f) Defendant's curtrix".

Here, in her capacity as attorney for the Care Center, also known as and referred to as Medex in the Indictment.[4] Broussard sought to secure legal counsel for past and present employees of the Care Center only after receiving a phone call from the Care Center's Office Manager, Office Manager 1. Office Manager 1 advised Broussard that she had received calls from former employees who had been communicating with other employees; the former employee advised that she was upset and the other employees felt they needed legal counsel. Office Manager 1 further advised that she was tired and felt intimidated because she had given three or four interviews to

[4] See Louisiana Secretary of State website, the Care Center has been in operation since August 20, 2007. It appears the two entity names have been used interchangeably over the years.

the Government, that they had come to her home several times and that she did not feel she could refuse the Government's request to interview her again because she feared being indicted. She advised that she did not feel that anyone was looking out for her or the other employees that were being pressured by the Government. Broussard advised Office Manager I that she could not give her legal advice but that she would look in to the matter. Broussard promptly informed defense counsel of the employees concerns. Defense counsel advised that the employees needed pool counsel to represent them. Broussard, in her capacity as legal counsel for The Care Center, contacted the Burgos Law Firm (hereinafter "Burgos") to serve as pool counsel for Care Center employees. Burgos has a reputation for being competent, ethical and independent.

Burgos advised that the matter would be assigned to Attorney N. Blake Peters (hereinafter "Blake") for review. Broussard does not know Blake and has never met Blake. Prior to the call to Burgos, Broussard had never spoken to Blake. In the initial conversation with Blake, the question of potential conflicts was raised. In accordance with the Protective Order, Broussard provided a copy of employee witness interviews, which were provided during discovery, to Blake because it was necessary.[5] Blake is required by the code of ethics to assess whether representing the pool of employees creates a potential conflict of interest. Broussard went above and beyond to avoid running afoul of the Court's Protective Order. While not directed by the Protective Order to limit her contact with Care Center employees who are potential defense witnesses, Broussard directed Office Manager 1 to notify the other employees of the availability of counsel to provide them with independent legal advice. Again, the Government has failed to show by clear and convincing evidence that Broussard in any way violated the Protective Order.

Moreover, Broussard was within her rights to retain pool counsel to represent and advise the Care Center employees. The New York Bar Association Formal Opinion 2019-4 discusses the role of pool counsel:

[5] Under Rule 1.7 of the ABA's Model Rules of Professional Conduct, "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest."

> "A lawyer serving in the role as "pool counsel" may concurrently represent multiple individuals as witnesses or potential witnesses in connection with a governmental investigation or corporate internal investigation, subject to the rules governing conflicts of interest and confidentiality.
>
> With regard to conflicts of interest: The lawyer must determine, before serving as pool counsel, whether the proposed representation will involve a concurrent conflict of interest. That would be the case, where, for example, one prospective pool client would testify adversely against another prospective pool client. If the lawyer determines that there is a conflict of interest but that the lawyer can nevertheless represent each prospective client competently and diligently, the lawyer may represent the individuals, but only with the informed consent of each client confirmed in writing. Even where there is no conflict of interest triggering the Rule 1.7 obligation to obtain informed client consent to the multiple representation confirmed in writing, the Rule 1.4 obligation to explain a matter to the extent reasonably necessary to permit the client to make informed decisions may require the same disclosures about the risks and advantages of the multiple representation. The advisable course is for the lawyer to confirm in writing the client's consent to the multiple representation in any event. Once the representation commences, the lawyer must identify, and respond appropriately to, any conflicts of interest that may arise"… . Conflicts of interest must be addressed before undertaking a representation. See Rule 1.7, Cmt. [2]." See https://www.nycbar.org/reports/formal-opinion-2019-4-representing-multiple-individuals-in-the-context-of-a-governmental-or-internal-investigation/.

Clearly, the employee statements were necessary in determining whether a concurrent conflict of interest was present. The Government has failed to present any evidence, much less clear and convincing evidence, that Broussard violated this Court's Protective Order.

**III.**

**COMPANY'S PAYMENT OF LEGAL FEES IS NOT A CONFLICT OF INTEREST**

"The organization subject of the investigation typically engages pool counsel and recommends their services to certain individuals, such as current or former employees. Pool counsel can only represent pool members with no conflicting interests with one another. Even

though the organization typically pays pool counsel's fees, pool counsel do not also represent the organization".[6]

The employees have a Sixth Amendment right to independent counsel. The U.S. Supreme Court has written that "[c]ases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v. Morrison*, 449 U.S. 361, 364 (1981). *Accord* U.S. v. Stein, 541 F.3d 130, 155 (2d Cir. 2008) (citing *U.S. v. Farmer* in the context of an employer's advancement of fees to employees); see also *id.* at 156 ("In a nutshell, the Sixth Amendment protects against unjustified governmental interference with the right to defend oneself using whatever assets one has or might reasonably and lawfully obtain."). *Corporate Crime and Abuse: Tracking the Problem*, Ctr. for Corp. Policy. See *United States v. Stein*, 435 F. Supp. 2d 330 (S.D.N.Y. 2006). In short, Judge Kaplan concluded that the government's "zeal" to prosecute crimes clouded its judgment and caused it to "violate[ ] the Constitution it is sworn to defend." *Id.* at 336.

In the instant case, it is the Care Center, not Broussard nor Talbot, that has agreed to pay the pool of employees legal fees. The Government argues that there is something nefarious about the Care Center paying for its employees to have independent counsel is without merit. Simply put, organizations under scrutiny typically pay the pool counsel's fees on behalf of the employee/clients, but is not itself a client of the pool counsel.[7] Because Burgos does not represent Broussard, Talbot or the Care Center, covering employees legal fees is not a conflict of interest.

[6]https://content.next.westlaw.com/practical-law/document/I0bb49acc25f211ecbea4f0dc9fb69570/Pool-Counsel?viewType=FullText&transitionType=Default&contextData=(sc.Default)

[7] *See* NYCBA Prof'l Ethics Comm., Formal Op. 2004-02 (2004) (addressing the circumstances where counsel simultaneously represents a corporation and its officers or employees in the context of a governmental representation).

Public defenders, for example, are typically paid by the government, but they owe a duty of loyalty to their clients, not to the entity that issues their salaries. Similarly, in the instant case, Burgos has been retain to offer the employees independent legal advice. Broussard is not a party to this case and Talbot is represented by able counsel, therefore, there is no conflict of interest.

## CONCLUSION

Because the Government has failed to bear the burden of proof to establish that Broussard violated the Defendant's Condition of Release or the Protective Order by clear and convincing evidence, this Court should deny the Government's Motion for Civil Contempt.

Respectfully submitted.

**BROUSSARD BALONEY LAW FIRM, APC**

*s/Abril Baloney Sutherland*

Geri Broussard Baloney La Bar #24012
Abril Baloney Sutherland, La Bar #29028
201 St. Charles Avenue, Suite 2557B
New Orleans, Louisiana 70170
Telephone (504) 332-2889
Facsimile. (504)332-0574
gbroussard@bblf.com
abril.sutherland@gmail.com

EXHIBIT
"A"



6-Mar-2023

Dear Dr. Begali:

I have been asked by Ms. Geri Broussard to review select documents involving Mr. Adrian Talbot in order to address specific questions in Dr. Michael Chafetz's neuropsychological assessment dated 12-9-2021 (i.e., "the Neuropsychological Evaluation"), namely, to identify and list the performance validity tests (PVTs) used in the evaluation and to discuss whether there were issues in Dr. Chafetz's use of the ACS PVTs or relating to the broader use of malingering criteria. My aim is to provide a balanced view of the specific issues listed. I will not be addressing or commenting on the larger question of the examinee's competency to stand trial or on other aspects of this examinee's case.

As you may know, I am an author of the original malingering criteria primarily used in the field of neuropsychology (Slick, Sherman, & Iverson, 1999) as well as the author of its newly published revision (Sherman, Slick, & Iverson, 2020). I am also an author of the *Compendium of Neuropsychological Tests* (Sherman, Tan, and Hrabok, in press; Strauss, Sherman, & Spreen, 2006), a desk reference on neuropsychological assessment that includes a detailed overview of performance validity tests.

***PVTs Used in the Evaluation***

Based on information in Dr. Chafetz's initial report (Neuropsychological Evaluation, 12-9-2021) and in a response by Dr. Chafetz to the reports of Dr. Begali and Dr. Croft (Response report, 2-9-2022), the specific PVTs in the evaluation are shown in Column 1. Column 2, in bold, shows the names of the PVTs based on information provided in the Neuropsychological Evaluation and in the Response report. Because not all PVTs were named, the specific PVTs were deduced based on their description as per page 9 of the Neuropsychological Evaluation.

The Neuropsychological Evaluation indicated that 8 PVTs were administered in total. This was later amended to include the b Test which had not been listed in the Neuropsychological Report as was indicated in the Response report, yielding a total of 9 PVTs administered.

With regard to invalidity, the Neuropsychological Evaluation specified the following:

> *The defendant passed 6 of 8 performance validity tests, failing two of the ACS measures at a relatively high cutoff level. However, failing two of these ACS measures at the level has a low false positive rate (1%) in someone with his General Abilities Index. This finding provides evidence for an invalid response set, particularly when taken together with other inconsistencies and atypical responding. (p. 9)*

Thus based on these statements, it appears that the conclusion that there was an invalid response set was based primarily on results from the ACS PVTs administered and not on the other PVTs. As a result, it is important to understand how the ACS PVTs work in detecting invalid results and to determine whether the approach used was valid. The broader issue of interpreting all PVTs administered is also addressed later in this report.

***Table 1. PVTs Administered***

| Validity Tests as per the Neuropsychological Evaluation | Full Test Name | Pass/Fail as per the Neuropsychological Evaluation | Comment |
|---|---|---|---|
| *ACS - RDS* | **Reliable Digit Span** | Pass > 25% | Clearly passed |
| *ACS - WCT* | **Word Choice** | Pass > 25% | Clearly passed |
| *ACS - LM* | **Logical Memory II Recognition (LM Recog)** | Pass > 25% | Clearly passed |
| *ACS – VR Rec* | **Visual Reproduction II Recognition (VR Recog)** | Fail ≤ 25% | See comments in text |
| *ACS – VPA Rec* | **Verbal Paired Associates II Recognition (VPA Recog)** | Fail ≤ 25% | See comments in text |
| *Short Validity Test* | **MSVT*** | Pass | Clearly passed<br>*Presumably MVST because it is based on three percentage scores (see Table on page 9 in Dr. Chafetz's Neuropsychological Evaluation report) |
| *Visual Validity Test* | **TOMM**** | Pass | Clearly passed<br>**Presumably TOMM because based on 3 sets of 50 items (see Table on page 9 in Dr. Chafetz's Neuropsychological Evaluation report) |
| *A-Test* | | Pass | This may be a scale used in the Social Security Exam as per Dr. Chafetz's prior publications – unknown if this is the case, but this test does not appear to be mentioned in the Neuropsychological Evaluation report specifically |
| **Validity Tests Not Listed in the Neuropsychological Evaluation but Mentioned in the Response Report** | | | |
| | **b Test***** | Pass | Mentioned on page 10 of Dr. Chafetz's Response report but not in the Neuropsychological Evaluation |

***Considerations in the Use of ACS PVTs***

The 5 ACS PVTs are Word Choice, Logical Memory II Recognition, Verbal Paired Associates II Recognition, Visual Reproduction II Recognition, and Reliable Digit Span; these PVTs are intended to be interpreted in aggregate to detect invalid responding although they can also be used as standalone PVTs.

The ACS PVTs identify examinees who are exaggerating based on comparison to a clinical sample that specifically excludes people with dementia; the user may also choose to compare the examinee to other subgroups that fit the examinee's demographics such as education level, race/ethnicity, or General Ability Index (GAI), an estimate of IQ.

***ACS Cutoffs***

The question of which cutoff to use for the ACS PVTs deserves special attention; this is because the ACS PVTs are complex to interpret and use a different method for determining invalidity than do most other PVTs.

The ACS PVTs differ from other PVTs in that the user chooses the cutoff to be used as the basis of invalid PVT scores. The user can choose between cutoffs of ≤ 25%, ≤ 15%, ≤ 10%, ≤ 5%, and ≤ 2% reflecting cumulative frequencies in the clinical sample. Among these cutoffs, the least restrictive cutoff is ≤ 25%; it will yield the greatest number of exaggerators but at the risk of increased false positives (i.e.,

misidentifying people who are not exaggerating as exaggerators). The most restrictive cutoff is ≤ 2%; it will have the lowest risk of false positives but at the risk of not identifying all exaggerators.

In Dr. Chafetz's report, a ≤ 25% cutoff was used for determining invalidity, meaning that failure was defined as scores falling at or below those of 25% of the ACS clinical sample. This is the least restrictive cutoff and hence the cutoff with the greatest risk of false positives.

The ACS manual recommends a conservative approach when interpreting ACS PVTs for the determination of malingering. Specifically, the ACS manual indicates that cutoffs should be set *a priori* taking into account the individual's background such that an acceptable false-positive rate is maintained. The ACS manual also indicates that the false-positive rate should be 10% or less and that the clinician use either the 10% or the 15% cutoff because these have acceptable false-positive rates for most clinical and control samples. The manual further indicates that in cases where it is believed that there was a subtle attempt to exaggerate symptoms, the less restrictive cutoff of 25% can be used; however, the manual indicates that this should be based on failure on 3 or more out of the 5 ACS PVTs (p. 101, ACS Manual).

This differs from the approach described in the Neuropsychological Evaluation. Instead of the 10% or 15% cutoffs recommended in the ACS manual, the less stringent 25% cutoff was used, as was a standard of 2 failed PVTs for determining invalidity instead of the 3 recommended for the 25% cutoff in the manual.

To be clear, the use of a 25% cutoff is not technically incorrect and there can be valid reasons for selecting this specific cutoff. Usually, when this is the case, a rationale for selecting this cutoff is provided.

***ACS Cutoffs and the Malingering Criteria***

Based on the score table on page 9 of the Neuropsychological Evaluation, the examinee obtained a VR Recog score of 4 and a VPA Recog score of 35. Based on the ACS manual, both of these scores are exactly at the ≤ 25% cutoff in the clinical sample, that is, at the very top of the range of possible scores falling in the invalid range using this specific cutoff. For example, in the case of VR Recog, one more point on the test would have made the score valid. Thus, although the scores are technically invalid when using this specific cutoff, they are extremely close to the valid range and are thus not a major deviation from the scores obtained by examinees responding validly on the tests. As well, a ≤ 25% cutoff means that 25% of the ACS clinical sample (i.e., non-exaggerating individuals with clinical conditions) had scores at or below the examinee's scores. This is a fairly large number of non-malingering examinees that translates to a false-positive rate of 25% for each individual PVT.

A cutoff of 25% does not satisfy the criterion for *individual PVTs* as per the Malingering Criteria, which specify that each PVT cutoff should have a false-positive rate of 10% or less. However, Criteria B1b of the Malingering Criteria, "Invalid Neurocognitive Presentation", does specify the following regarding using aggregate PVTs:

> *Invalid Scores on PVTs.* Psychometric evidence of invalid cognitive test performance based on (a) using at minimum two or more PVTs that <u>*alone or in combination*</u> have a low false-positive rate (i.e., .10), while taking into account the ratio of failed PVT scores to total number of PVTs administered (Sherman et al., 2020)

In this case, Dr. Chafetz did use two PVTs that together met the criterion for PVTs "that alone or in combination have a low false positive rate (i.e., .10)" because he used a comparison based on IQ level (i.e., GAI), a more stringent criterion that indicated that the examinee's scores were in the highly atypical and thus invalid range for someone with his level of IQ.

More specifically, Dr. Chafetz's Neuropsychological Evaluation indicated the following:

> *… failing two of these ACS measures at the level has a low false positive rate (1%) in someone with his General Abilities Index. This finding provides evidence for an invalid response set, particularly when taken together with other inconsistencies and atypical responding. (p. 9)*

This statement on the GAI is correct. The examinee had a GAI of 106 (66th percentile) as per the report, and thus an IQ falling in the range of IQ defined by a GAI of 100 to 114 in the ACS manual. According to the ACS manual, examinees with GAIs in this range very rarely fail 2 of 5 ACS validity indices; only 1% do so as was indicated in the Neuropsychological Evaluation. Thus, the use of the 25% cutoff in addition to the use of the examinee's GAI does satisfy the requirement for Criteria B1b in the Malingering Criteria, while keeping in mind the caveats already noted in addition to the following additional considerations.

Using a demographic benchmark such as the GAI to determine the validity of the ACS PVTs is of course an appropriate decision for the neuropsychologist to make when interpreting PVTs. However, there are usually more than one demographic benchmark that may apply to an examinee; choosing one over others may not take into account other more important demographic aspects of the examinee. This includes whether an individual is from a specific subgroup defined by ethnicity or clinical diagnosis, categories associated with a higher baseline PVT failure rate in non-exaggerating individuals. The specific demographic comparison used may thus affect whether an examinee's ACS PVT results are deemed invalid.

The Malingering Criteria do not require that the false-positive rate be defined based preferentially on IQ or on other demographic variables specific to the examinee, only that a false-positive rate of 10% be maintained when selecting PVTs. If no specific additional subgroup comparisons are used and only the overall clinical sample is used to determine invalidity at a cutoff of ≤ 25%, the results obtained by the examinee on the ACS PVTs yield a false-positive rate of 19%, a percentage that is excessive for malingering determination because it is above 10%.

However, if education had been used as the basis of comparison, with a very high education level consistent with the ACS category of ≤ 16 years, the examinee's scores would have been deemed invalid because only 2% of examinees with similar education fail 2 of 5 ACS PVTs at a 25% cutoff level.

Lastly, it is well known that failure rates vary by ethnicity, with calls in the field to develop PVT cutoffs for people of different ethnicities (e.g., Nijdam-Jones & Rosenfeld, 2017). This particular examinee is African American. According to the ACS manual, the false-positive rate in African-American examinees who fail 2 of 5 ACS PVTs at the ≤ 25% cutoff is 13%. This is a false-positive rate that is very close but slightly higher than the recommended false-positive rate of 10%.

Overall, in the absence of a stated rationale for selecting a particular subgroup, whether the results were deemed invalid will vary with the comparison group selected for this examinee.

***Number of Failed to Total PVTs Administered***

In people who are not malingering, there is a non-negligible rate of PVT failure. This rate varies across PVTs and across samples but generally speaking, honestly-responding, non-malingering examinees may fail between one out of 8 and one out of 4 PVTs depending on the study, *when each PVT cutoff is based on a false-positive rate of 10% or less*. This general principle is well known and explained in several neuropsychological papers and textbooks.

In the case of this examinee, PVT score invalidity appeared to be determined based only on the 5 ACS PVTs. It is difficult to ignore that this omits the rest of the PVTs administered in the evaluation, PVTs that are an important source of data for determining invalidity.

In the Malingering Criteria, under "Invalid Neurocognitive Presentation", Criterion B1b notes the importance of considering the number of PVTs administered and specifically, that the ratio of failed PVT scores to total number of PVTs administered should be taken into account (Sherman et al., 2020).

It is also noted that:

> … it is more appropriate to consider the *ratio* of PVT failures to total PVT scores rather than the absolute number of PVTs administered, with the assumption that most neuropsychologists will administer multiple PVTs in the neuropsychological evaluation to appropriately rule in/rule out malingering and to adequately sample validity throughout the assessment. For example, failing two of seven PVT scores would appear to meet criteria for invalid responding, as would failing four of 14 PVT scores; failing two of 14 PVT scores likely would not (i.e., because this would be equivalent to failing one out of seven PVTs). (Sherman et al., 2020)

In this case, the Neuropsychological Report indicates that the examinee failed two PVTs. However, these two PVT failures were based on a 25% cutoff and not on a 10% false-positive rate. In this case, when a 10% false-positive criterion is applied to the cutoffs of the 9 individual PVTs used, this yields no PVT failures out of 9 PVTs administered, a failure rate that does not meet the invalid performance criteria (B1b) for malingering.

There were also other embedded PVTs that were administered in the evaluation that were not included in the tally of PVTs. Review of page 21 of the Neuropsychological Evaluation indicates the following additional embedded PVTs supported by research in the malingering literature:

- Coding
- Symbol Search
- Trails A and B (i.e., considered one PVT due to high intercorrelations between the two parts of the test)
- Booklet Category Test

Adding these validated PVTs to the 9 PVTs specifically identified in the report yields 13 PVTs administered. None of the examinee's scores on these 13 PVTs were below invalidity cutoffs based on a 10% false-positive rate recommended in the literature for malingering determination.

If we conclude that the examinee failed two ACS PVTs that when combined have a false-positive rate of .10, this still leaves 11 passed PVTs, an overall pattern not meeting criteria for invalidity as per Criterion B1b.

***Final Thoughts***

An examinee may meet some but not all the Malingering Criteria; this does not mean that the examinee is not engaging in exaggeration of deficits. An examiner can always conclude, based on sufficient evidence, that the examinee was likely exaggerating their deficits even if the evidence falls short of a formal definition of malingering.

On the other hand, the Malingering Criteria were initially developed with an overarching view that an abundance of caution should be used in making determinations of malingering so that, as much as possible, non-malingering examinees were not falsely identified as malingerers – at the risk of failing to identify some malingering examinees. As such, a "reasonable doubt" strategy was initially recommended regarding decisions about malingering (Slick et al., 1999). Our most recent criteria explicitly state that the goal of the Malingering Criteria is to ensure that false-positive malingering determinations are minimized (Sherman et al., 2020). Misapplying the malingering criteria in favor of over-identifying malingering, no matter how well intentioned, will necessarily contradict the intentions of these malingering models.

Thank you for the opportunity to be of assistance.



Authorized electronic signature

Elisabeth Sherman, PhD, RPsych
Neuropsychologist

**REFERENCES**

Nijdam-Jones, A., & Rosenfeld, B. (2017). Cross-cultural feigning assessment: A systematic review of feigning instruments used with linguistically, ethnically, and culturally diverse samples. Psychological Assessment, 29(11), 1321–1336. https://doi.org/10.1037/pas0000438

Slick, D. J., Sherman, E. M., & Iverson, G. L. (1999). Diagnostic criteria for malingered neurocognitive dysfunction: Proposed standards for clinical practice and research. *The Clinical Neuropsychologist, 13(4)*, 545–561.

Sherman, E. M. S., Slick, D. J., & Iverson, G. L. (2020). Multidimensional malingering criteria for neuropsychological assessment: A 20-year update of the malingered neuropsychological dysfunction criteria. *Archives of Clinical Neuropsychology.* https://doi.org/10.1093/arclin/acaa019

Sherman, E. M. S., Tan, J.E., & Hrabok, M. (in press). *A compendium of neuropsychological tests (4th ed.)*. New York: Oxford University Press.

Strauss, E., Sherman, E.M.S., & Spreen, O. (2006). *A compendium of neuropsychological tests (3rd ed.)*. New York: Oxford University Press.